IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

BREEANN HAMMOND-THOMPSON,
    *Plaintiff*,

   v.

TEMPLE VIEW CAPITAL,
    *Defendant.*

Case No. 23-cv-1502-ABA

**MEMORANDUM OPINION**

Plaintiff BreeAnn Hammond-Thompson has sued her former employer, Temple View Capital ("TVC"), for employment discrimination and retaliation under state and federal law related to allegations of sexual harassment and assault. TVC responded by filing a counterclaim under of the Maryland Wiretap Act, alleging that Hammond recorded TVC employees without their consent.[1] Both parties have moved for summary judgment: TVC on all of Hammond's employment claims, and Hammond as to TVC's counterclaim. For the reasons explained below, the Court will grant both motions.

I.    **BACKGROUND**

    A.    **Hammond's employment at TVC**

At the summary judgment phase, the Court construes all the evidence in the light most favorable to the non-moving party. TVC has moved for summary judgment on all of Hammond's claims. Thus, for purposes of TVC's motion, the Court will recite the facts below concerning Hammond's employment at TVC from the record as reasonably construed in Hammond's favor.

---

[1] Plaintiff's brief refers to Plaintiff as "Ms. Hammond," not "Ms. Hammond-Thompson." ECF No. 62-1. The Court will follow the same convention.

### i.      TVC and Hammond's hiring

TVC is a lending company for residential real estate investors. ECF No. 62-2 at 4[2] (Deposition of James Baisley ("Baisley Dep.") 10:7–9). Hammond, and most of the employees relevant to this case, worked in TVC's "Outside Sales" department. Outside Sales was run overall by Matt Schlegel, Director of Sales, and James Baisley, Director of Outside Sales. *Id.* at 3–4 (Baisley Dep. 8:18–9:7). Schlegel was Baisley's supervisor in the organizational hierarchy, and mortgage salespeople (referred to as "account executives") within Outside Sales reported directly to Baisley. *Id.* at 4 (Baisley Dep. 9:2–22, 11:17–12:14).

Hammond began working at TVC as an account executive in March 2021. ECF No. 60-5 at 50 (offer letter). During her time there, there were approximately 28 account executives. ECF No. 62-2 at 47 (organizational chart as of March 2022). As explained in greater detail below, Hammond alleges that she was harassed by two other account executives: David Weintraub and David Gray. Although Weintraub, Gray, and Hammond all had the same title (account executive), Weintraub and Gray were variously referred to (and/or refer to themselves) as "directors" or "team leads" or "senior account executives." *See* ECF No. 62-2 at 4–5 (Baisley Dep. 12:7–13:1); (Baisley testifying that individuals with "director" titles are "essentially team leads," and that both Weintraub and Gray were team leads); *id.* at 26 (Deposition of David Weintraub ("Weintraub Dep.") 11:8–12:6) (Weintraub testifying that TVC "also called my title regional sales director"); *id.* at 91 (Deposition of David Gray ("Gray Dep.") 10:10–12:15) (Gray testifying that he was a senior account executive and that his "title was director of

---

[2] Citations to page numbers refer to CM/ECF pagination for this and the other filings referenced herein, which may not align with a document's original page numbering.

Mid-Atlantic sales"). "Team leads" at TVC, such as Weintraub and Gray, did not have ultimate authority to hire or fire employees but could be involved in such decisions, and they provided guidance to employees and informal performance reviews to Baisley or Schlegel. *Id.* at 4–5 (Baisley Dep. 12:18–13:18, 15:19–16:18).

Throughout her approximately 12-month employment at TVC (from March 2021 to March 2022), Hammond worked remotely, first in Kansas and later in Michigan, except for in-person attendance at a few conferences. ECF No. 63-1 at 10 (Deposition of BreeAnn Hammond-Thompson ("Hammond Dep.") 120:3–121:10). Hammond initially applied to be a junior account executive working directly for Weintraub. ECF No. 62-2 at 33 (Weintraub Dep. 59:2–7). Weintraub interviewed Hammond, but did not recommend her for the junior position because he felt she was overqualified. *Id.* at 58–63 (emails between Weintraub and TVC management). He instead sent her resume to Schlegel and Baisley, recommending she be hired for a different position. *Id.* Hammond was subsequently hired at the account executive level, and her offer letter specifies that she would report directly to Baisley. *Id.* at 128. Despite this, Hammond testified that at the beginning of her employment she considered Weintraub to be her boss (or at least one of her bosses) because he directed her actions, including instructing her to attend certain trainings and sales calls. *Id.* at 106 (Hammond Dep. 70:16–12; 73:7–17). Hammond also contends that Weintraub told her she was "safe at the company as long as he wanted [her] there." *Id.* at 134.

Hammond's contract specified performance metrics that she had to meet to remain employed. ECF No. 60-5 at 58. The metrics entailed hitting certain volumes of total loan sales each quarter. *Id.* Hammond never met these sales metrics, either in the second quarter of 2021 (the first full quarter after she was hired) or at any other time

during her employment. ECF No. 62-2 at 109 (Hammond Dep. 106:5–108:6).  She testified that Baisley and Weintraub led her to believe there was "flexibility" in the performance expectations and that they would "be patient with [her] learning the process." *Id.* at 110 (Hammond Dep. 110:11–13; 112:15–113:8). Hammond also contends that Weintraub told her that other account executives, specifically Griffin Eldridge, had performed below the specified expectations for several years and faced no repercussions. *Id.* at 110 (Hammond Dep. 111:7–112:11).

### ii.    Conflict with Weintraub and alleged harassment

Hammond contends that during this first part of her employment, while she considered herself to be working in some sense for Weintraub, he made sexual remarks and advances. Hammond testified that Weintraub asked her if she had ever been to the Hamptons and invited her to go with him, which she interpreted as a "sexual advance." *Id.* at 114 (Hammond Dep. 130:11–12). Hammond testified that she responded in a "nonconfrontational, hesitant" manner. *Id.* (Hammond Dep. 130:5). Hammond also testified that Weintraub once pointed his camera "in the region of his crotch" during a video call and made comments about her appearance being "helpful" to her success "in the loan industry." *Id.* at 113 (Hammond Dep. 126:6–127:3).

In September 2021, Hammond and Weintraub had a conflict over sales leads. *Id.* at 163–200 (Teams messages between Hammond and Weintraub). Hammond had attempted to pursue leads that appeared in Salesforce as having no contact from a TVC salesperson within the preceding 90 days. *See id.*; ECF No. 60-5 at 83 (emails between Hammond and Baisley regarding leads dispute). After Hammond wrote to Baisley seeking clarification, Baisley explained that "[g]enerally . . . if no one has talked to or touched the account, you know, within a 90-day period, and you encounter that person,

whether it be in person or they call into you somehow, find a business card of yours, whatever, then that lead is eligible to be moved over to you." ECF No. 60-3 at 16–17 (Baisley Dep. 61:10–63:9). But Baisley explained that Weintraub was a "special guy" because he was a "prolific producer" with "tens of thousands of accounts in Salesforce." *Id.* at 17 (Baisley Dep. 62:16–18); *see also* ECF No. 60-5 at 83 (email exchange in which Hammond asked to confirm her understanding that "[i]f there is no recent activity within the last 90 days or so" she could "take ownership of the lead and work it as my own," and Baisley responded, "David W is a special guy...but you are correct in how you have been doing anything. I would say anyone but him and you are fine. Apologies for any david related drama"). Hammond thanked Baisley for the explanation given that "the whole issue with David is stemming from a duplicate lead scenario" and observed that Baisley "knew exactly why [she] was asking the question." ECF No. 60-5 at 82. Hammond ended that email, on September 30, 2021, stating, "I really am grateful for the opportunity to be part of the TVC family. I'm working hard every day to learn more and perform better in closing loans. Drama detracts from that goal and I don't have time for it, ha!" *Id.* Hammond also contends that she discussed her concerns about the "leads" situation in phone conversations with Schlegel in November 2021, and in response Schlegel stated that "Weintraub does not follow rules because he makes millions for the company." ECF No. 62-2 at 135.

Hammond testified that the conflict over whether she should be contacting "leads" designated under Weintraub's name in Salesforce led her to "suggest[] that [she and Weintraub] don't work closely together anymore." *Id.* at 117 (Hammond Dep. 187:18–188:6). This is also reflected in their Teams messages. *Id.* at 197–98 (Hammond: "I have doubts . . . as to whether our personality types are suited to work on

a close-knit team" because "I do not do well with accusations about my ability to do a simple job well" or "with someone advising me of what 'common sense' is when it just so happens to be contrary to how I was trained (by your superiors).").

In the discussions with Baisley and Schlegel in September through November 2021, during which Hammond complained to Baisley and Schlegel about Weintraub's handling of the dispute over Hammond contacting Weintraub's "leads," Hammond did not raise any complaints about sexual harassment. ECF No. 60-5 at 16 (Hammond Dep. 141:2–21). Hammond testified that she did not tell either Schlegel or Baisley or "anyone else at [TVC]" about Weintraub's harassing behavior because, when she raised the dispute over the leads, "they started telling me the information about he, Weintraub was allowed to break the rules, he makes so much money for the company." *Id.* Hammond did not raise Weintraub's alleged sexual harassment at any other point prior to her termination. *Id*; *see also* ECF No. 73 (motions hearing) ("Court: [L]et me be precise on that. You do not contend that there's any evidence in the record that she told [Schlegel or Baisley] that anyone was sexually harassing her. [Counsel for Ms. Hammond]: That is correct. She did not tell them.").

In parallel to the leads dispute, Hammond's sales performance at TVC came into question. In mid-September 2021, Baisley, Schlegel, and Michael Niccolini (a TVC partner), ECF No. 62-2 at 4 (Baisley Dep. 9:11–13), had begun discussing how to handle the discrepancy between TVC's most successful producers ("people crushing it") and others who were "lagging behind." ECF No. 60-10 at 4. On September 21, 2021, Baisley identified a list of employees that showed that in the first two months of the third quarter, of the 23 account executives listed, Hammond had the lowest number of loans (1) and the second-lowest total loan volume. *Id.* at 2. Baisley specifically identified two

employees he was "most concerned about": Hammond and Eldridge. *Id.* at 3. By mid-October, Baisley had decided to issue warnings and place on "performance plan[s]/write ups" for the month of November three employees who all were falling short on productivity metrics: Hammond, Eldridge, and Chris Manna. ECF No. 64-1 at 2.

On November 1, 2021, Schlegel issued Hammond a formal "Record of Written Warning." ECF No. 62-2 at 145–46. The written warning noted that her "production minimums" were "$1,000,000 per month in funded dollar volume/$3,000,000 per quarter in funded dollar volume" and that her "productivity . . . has been below expectations in all categories" (referring to loans registered, submitted, and funded). *Id.* at 145. The written warning stated, "If this perforamnce [*sic*] issue is not corrected, or there are different issues, or other types of violations to our handbook, further disciplinay [*sic*] action will be taken up to and including termination of your employment." *Id.* It also stated, "A follow-up assessment will be completed on or about November 15th, 2021 to measure his [*sic*] progress on the desired performance improvement." *Id.* In her calls with Baisley and Schlegel regarding the conflict with Weintraub, Hammond also discussed her sales numbers and the warning letter. ECF No. 62-2 at 133–35.

### iii.   Gray's alleged harassment

Hammond contends that after the fall-out with Weintraub, she moved to Gray's team and was supervised by him. She began the process of moving to Gray's team in October 2021, and "officially" moved in January 2022. ECF No. 62-2 at 92 (Gray Dep. 14:12), 119 (Hammond Dep. 207:18–20).

Hammond claims that Gray began sexually harassing her shortly after they started working together. As noted above, Hammond worked remotely, and so her

interactions with Gray—like with Weintraub—were almost entirely via phone calls or video calls. She testified that he frequently made comments about her appearance, asked her to make sure her video camera was on during calls, and kept her on "excessive[ly]" long calls of several hours. *Id.* at 120 (Hammond Dep. 223:19–224:12). Hammond testified that she opposed this behavior in "nonconfrontational ways" by "diverting conversation off of [her] looks." *Id.* (Hammond Dep. 225:12–17).

The alleged harassment continued at three conferences that Hammond and Gray attended together in November and December 2021. At the first conference, in Detroit, Hammond contends that Gray invited her to stay in his hotel room and made further comments about her appearance. *Id.* at 121 (Hammond Dep. 232:5–10). At the second conference, in Atlantic City, Hammond contends that Gray booked adjoining hotel rooms for them and "coerced [her] to have sex with him." *Id.* at 139 (interrogatory responses); *see also id.* 122–124 (Hammond's deposition testimony concerning the sexual encounter at the second conference). Hammond contends that, at some point after this, Gray stated he "'felt bad' he 'had to force [Hammond] to have sex' with him." *Id.* at 134. Hammond contends that at the third conference, which was also in Atlantic City, Gray asked her to come to his hotel room, and she refused. *Id.* at 136–37. Gray responded to her refusal by taking her luggage and storing it in his hotel room to coerce Hammond to come to his room. *Id.* Hammond contends that she refused his advances several more times, but that she eventually went to Gray's room to retrieve her luggage. *Id.* at 137. Hammond states that when she arrived in his room, Gray took off his clothes and again attempted to sexually assault her, but that she "tried to cause a non-threatening scene" and stated "[y]ou think this is a fucking game! This is my life and my career! Give me my bag! I'm out of here!" *Id.* During that same trip, Hammond alleges

8

that Gray groped her, and separately masturbated while on the phone with her and "required [her] to participate." ECF No. 62-2 at 139. Hammond did not report Gray's conduct to anyone at TVC. ECF No. 60-5 at 44 (Hammond Dep. 296:19–21).

### iv.   Hammond's resignation

Meanwhile, Hammond's sales numbers at TVC remained below the benchmarks that she was expected to meet. TVC, through Schlegel, issued a "final written warning" to Hammond on December 1, 2021. ECF No. 60-17 at 4–5. This write-up contained the same language concerning possible termination if the sales numbers were not improved, and also stated that there would be a follow-up assessment in mid-December. *Id.* at 4. Hammond's numbers did not improve, and Schlegel emailed Gray on December 23, 2021 stating that they would have to issue Hammond "another final written warning." ECF No. 60-12 at 59. Schlegel stated that Gray "should probably be on that call since you're taking her under your wing for her final shot here." *Id.* TVC issued the *final* "final warning" to Hammond on February 25, 2022. ECF No. 60-12 at 60–61. The letter again noted that Hammond could be terminated if her numbers did not improve. *Id.* at 60. Whereas the prior warning letters had been signed by Schlegel, the February 2022 warning letter was signed by Gray. *Id.* at 61.

Hammond acknowledged receipt of that last warning on February 28, 2022. *Id.* Two and a half weeks later, she resigned, on March 18, 2022. ECF No. 62-2 at 48. TVC had already been planning to fire her. On the same day Hammond sent her resignation letter, Gray forwarded Hammond's email to Rachel Slane, who worked for TVC's human resources department, writing "please see resignation letter from BreeAnn below. As a reminder, she was on her last written warning and we planned to terminate at the end of this month pending production volume." *Id.*

### B.    Hammond's recordings

As noted above, after Hammond sued TVC, it came to TVC's attention that during her employment she had been audio-recording many conversations with co-workers and supervisors. *See* ECF No. 34 ¶ 3 (TVC's amended answer and counterclaim). Based on that information, TVC filed a counterclaim against Hammond, under Md. Code Ann., Cts. & Jud. Proc. § 10-402(a) (hereafter the "Maryland Wiretap Act"), which as explained below, when it applies, prohibits audio-recording of conversations without the consent of the other participant(s) in the conversation. Hammond contends that she is entitled to summary judgment because, as a matter of law, the Maryland Wiretap Act only creates civil liability if the person doing the recording is located in Maryland. ECF No. 75 at 1, 4. On this issue, the Court considers the record in the light most favorable to TVC as the nonmovant.

During her time at TVC, Hammond had a "general practice" of "record[ing] calls." ECF No. 65-1 at 3 (Hammond Dep. 362:21). In discovery in this case, she produced 243 recordings of conversations with co-workers and supervisors. ECF No. 63-1 at 19–104. Her "procedure" for creating those recordings was to have her iPad "close at hand" during phone or video calls, and she would use an app on the iPad to audio-record the calls. ECF No. 65-1 at 3 (Hammond Dep. 362:6–18). These included recordings of conversations with Weintraub, Gray, Schlegel, and Baisley. *See* ECF No. 63-1 at 19–104.

The record is not entirely clear on where Hammond or the other participants were located during the recorded calls. Hammond contends that she was at her home in Kansas when nearly all of the recordings were made, *see id.*, but for many of them she "cannot assert with certainty" where she was located. *See, e.g.*, ECF No. 63-1 at 36. Some

of the individuals who were recorded were in Maryland at the time of recording (including Gray, who resided in Maryland); others were not (such as Weintraub, who resided in California). ECF No. 63-1 at 20–21. Hammond admits that she did not obtain consent from the other participants for any of these recordings. ECF No. 65-2 at 4 (Hammond Dep., vol. 2 44:2–6). She testified that her understanding was that recordings were permitted because she lived in a "one-party state," referring to states where "as long as I was a part of the conversation, that I was legally allowed to record." *Id.* (Hammond Dep., vol. 2 44:7–16). Hammond obtained a law degree prior to working at TVC. *Id.*

### C.    Procedural history

Hammond asserts two causes of action.[3] Count 1 is for retaliation under the Montgomery County Code (MCC), Maryland Fair Employment Practices Act (MFEPA), Title VII, and the Kansas Act Against Discrimination (KAAD). Count 2 is for harassment and hostile work environment under the same four statutes. Hammond had previously asserted a claim for constructive discharge, but has withdrawn that claim. ECF No. 60-2 at 2–3. TVC subsequently brought its counterclaim for violation of the Maryland Wiretap Act. ECF No. 34 at 10. Both parties have moved for summary judgment: TVC on Hammond's retaliation and hostile work environment claims, as well as on her demand for punitive damages, ECF No. 60, and Hammond as to TVC's counterclaim, ECF Nos. 63, 75.

---

[3] In Hammond's complaint, she alleged that she filed charges of discrimination with the EEOC and the Howard County Office of Human Rights. ECF No. 1 ¶ 4. Although those charges of discrimination do not appear to be in the record, TVC does not dispute that Hammond complied with the exhaustion requirements for her claims.

## II.    LEGAL STANDARD

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A moving party meets its burden when the nonmovant "fails to make a showing sufficient to establish the existence of an element essential to that party's case" and when the nonmovant bears "the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). If the non-moving party fails to confront the motion with "sufficient evidence . . . for a jury to return a verdict for that party," the movant is entitled to summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); *Celotex*, 477 U.S. at 323 ("[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 ("When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts."). In making this determination, the Court views all facts, and all reasonable inferences drawn from those facts, in the light most favorable to the nonmoving party. *Matsushita*, 475 U.S. at 587–88. "When cross-motions for summary judgment are before a court, the court examines each motion separately, employing the familiar standard under Rule 56 of the Federal Rules of Civil Procedure." *Simply Wireless, Inc. v. T-Mobile US, Inc.*, 115 F.4th 266, 277 (4th Cir. 2024) (quoting *Desmond v. PNGI Charles Town Gaming, L.L.C.*, 630 F.3d 351, 354 (4th Cir. 2011)).

### III.   DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ON PLAINTIFF'S CLAIMS

#### A.   Hostile work environment (Count 2)

"Title VII makes it illegal for an employer 'to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.'" *Williams v. Silver Spring Volunteer Fire Dep't*, 86 F. Supp. 3d 398, 411 (D. Md. 2015) (quoting 42 U.S.C. § 2000e–2(a)). "Courts have long endorsed and adopted the . . . interpretation that sexual harassment is a form of prohibited sex discrimination." *Id.* (quoting *Bruce v. Fair Collections & Outsourcing, Inc.,* Case No. 13–3200, 2014 WL 3052477, at *3 (D. Md. June 30, 2014)). There are two types of sexual harassment claims under Title VII: "harassment that creates an offensive or hostile work environment and *quid pro quo* sexual harassment, where sexual consideration is demanded in exchange for job benefits." *Rachel-Smith v. FTData, Inc.*, 247 F. Supp. 2d 734, 745 (D. Md. 2003). Hammond is pursuing Count 2 under the first category, hostile work environment.

"[T]o prove a hostile work environment claim under Title VII, a plaintiff must show '(1) unwelcome conduct; (2) that is based on the plaintiff's [protected status]; (3) which is sufficiently severe or pervasive to alter her conditions of employment and to create an abusive work environment; and (4) which is imputable to the employer.'" *Strothers v. City of Laurel, Maryland*, 895 F.3d 317, 328 (4th Cir. 2018) (quoting *Okoli v. City Of Baltimore*, 648 F.3d 216, 220 (4th Cir. 2011)). TVC contends it is entitled to summary judgment on this claim because (a) Gray and Weintraub's alleged harassment was not imputable to TVC under element 4 and (b) even if their actions were imputable,

TVC should prevail under the *Faragher-Ellerth* affirmative defense. ECF No. 60-1 at 24–25. The Court will assume that Gray and Weintraub's actions were imputable because, regardless, TVC is entitled to summary judgment on Count 2 because the undisputed evidence in the record establishes that it prevails on its *Faragher-Ellerth* defense.

### i.    *Faragher-Ellerth* defense

The *Faragher-Ellerth* defense, where applicable, allows an employer to escape vicarious liability for hostile work environment claims under Title VII. *See Faragher v. City of Boca Raton,* 524 U.S. 775 (1998); *Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742 (1998). "Before reaching the defense, courts must first determine whether the company took a tangible employment action against the employee. The defense is unavailable if the employer has done so." *Dulaney v. Packaging Corp. of Am.*, 673 F.3d 323, 330–31 (4th Cir. 2012). A "tangible employment action" is "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Id. (*quoting *Ellerth,* 524 U.S. at 761). Hammond has not contended that there was a tangible employment action here, as she resigned before she was fired by TVC, so the *Faragher-Ellerth* defense is available.

Under the *Faragher-Ellerth* framework, the employer must prove two elements: (1) "that it exercised reasonable care in preventing and promptly correcting any sexually harassing behavior" and (2) "that 'the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.'" *E.E.O.C. v. R&R Ventures*, 244 F.3d 334, 341 (4th Cir. 2001) (citing and quoting *Faragher*, 524 U.S. at 807; *Ellerth,* 524 U.S. at 765). TVC contends

14

that even construing the evidence in the light most favorable to Hammond, any reasonable juror would conclude that TVC has satisfied both prongs. ECF No. 60-1 at 24.

On the first prong, "[t]he Fourth Circuit has repeatedly affirmed that '[d]istribution of an anti-harassment policy provides 'compelling proof' that the company exercised reasonable care in preventing and promptly correcting sexual harassment.'" *Hale v. Mayor & Council of Baltimore City*, Case No. 20-cv-503-SAG, 2022 WL 374512, at *9 (D. Md. Feb. 8, 2022) (quoting *Barrett v. Applied Radiant Energy Corp.*, 240 F.3d 262, 266 (4th Cir. 2001)). Once the employer has proven that it distributed an anti-harassment policy, "the 'only way to rebut this proof' is upon a showing that the employer adopted or administered the policy in bad faith or that the policy was otherwise defective or dysfunctional." *McKinney v. G4S Gov't Sols., Inc.*, 711 F. App'x 130, 135 (4th Cir. 2017) (quoting *Barrett*, 240 F.3d at 266). An anti-harassment policy may be defective, for example, if it "fail[s] to place any duty on supervisors to report incidents of sexual harassment to their superiors." *Hammoud v. Jimmy's Seafood, Inc.*, Case No. 21-cv-1593-MJM, 2024 WL 2749696, at *13 (D. Md. May 29, 2024) (quoting *Ocheltree v. Scollon Prods., Inc.*, 335 F.3d 325, 334 (4th Cir. 2003)). An otherwise sufficient policy can also sometimes fail in its implementation, but only when the record shows "a fundamental failure or refusal to enforce a policy." *Zerfas v. Burwell*, Case No. 14-cv-2806-PWG, 2015 WL 3949372, at *12 (D. Md. June 26, 2015) (citing *White v. BFI Waste Servs., LLC,* 375 F.3d 288, 299–300 (4th Cir. 2004)).

There is no dispute that TVC adopted and promulgated an anti-harassment policy in its employee handbook that included a mechanism for reporting complaints. ECF No. 62-1 at 25; ECF No. 60-5 at 111–13. The policy provides that "[i]f an employee

believes that she or he has been subjected to sexual harassment, whether by a supervisor, a co-worker or any other person with whom the employee comes in contact in connection with his/her work for the Company," the employee "should report the incident immediately to his/her manager or to Michael Niccolini." ECF No. 60-5 at 112. Niccolini is a partner at TVC. ECF No. 62-2 at 4 (Baisley Dep. 9:11–13). Unlike the policy in *Hammoud*, in which supervisors were not required to report harassment, 2024 WL 2749696, at *13–14, TVC's policy did require such reporting: "any manager or supervisor who receives a complaint of sexual harassment from an employee . . . is expected to report the incident promptly to Michael Niccolini for investigation." ECF No. 60-5 at 113. Hammond acknowledged receiving a copy of this handbook during an orientation training. ECF No. 60-5 at 33–34 (Hammond Dep. 200:2–8).

Hammond does not dispute that TVC had an anti-harassment policy and that it was facially sufficient. Instead, she attempts to show that the policy was implemented deficiently or in bad faith. She makes three arguments to support this contention, but the undisputed evidence in the record establishes that none succeeds.

First, Hammond argues TVC failed to train its employees on the handbook. Her primary evidence for this is Weintraub's testimony that he did not recall an anti-harassment training and that he was aware of harassment concerns by another employee, Lauren Meyers, but failed to take action. ECF No. 62-1 at 25–26; *see also* ECF No. 62-2 at 37–38 (Weintraub Dep. 103:15–104:10, 106:11–108:13). As TVC notes, this partially misconstrues Weintraub's testimony, which included the statement that he at least recalled a handbook orientation when he started at TVC and that the potential harassment complaint from Meyers was general in nature and may have involved someone who was not a TVC employee. ECF No. 62-2 at 37–38 (Weintraub Dep.

16

103:22–104:6) ("Q. . . . [S]o you don't recall one way or another if you ever attended any classes on how to avoid sexual harassment? A. I believe when I started . . . there was a . . . general handbook meeting."; "Q. And do you know one way or the other if the person who made [Meyers] feel uncomfortable is a TVC employee? A. No, I don't. I don't recall."). But even construing these statements in the light most favorable to Hammond, they are still not evidence that TVC's anti-harassment policy was adopted "in bad faith." Regarding Weintraub's lack of memory of the training, this testimony cannot support the conclusion that TVC's policy was defectively implemented wholesale. *See Matvia v. Bald Head Island Mgmt., Inc.*, 259 F.3d 261, 268 (4th Cir. 2001) ("In the face of a policy that clearly defines sexual harassment and to whom harassment should be reported, [Plaintiff] cannot survive summary judgment by claiming that employees failed to recall their orientation briefings."); *see also Walton v. N. Carolina Dep't of Agric. & Consumer Servs.*, 494 F. App'x 300, 302 (4th Cir. 2012) ("That [Plaintiff's] co-workers may not have understood the policy, however, does not establish that [Plaintiff] herself did not understand it."). Weintraub's testimony concerning Myers also does not establish that the policy was defective or adopted in bad faith. To overcome an employer's promulgation of a reasonable anti-harassment policy, a plaintiff needs to show "fundamental failure or refusal to enforce a policy" sufficient to demonstrate that the employer administered the policy "in bad faith." *Zerfas*, 2015 WL 3949372, at *12; *see also McKinney*, 711 F. App'x at 136 ("Discrete pockets of resistance do not show that the entire policy was defective or adopted in bad faith."). Weintraub's testimony may show incidents of the policy not being executed perfectly, but even taken together, no

17

reasonable juror could conclude from this evidence that TVC fundamentally failed or refused to enforce its anti-sexual harassment policy in bad faith.[4]

Second, Hammond argues that TVC implemented its policy in a deficient manner because Schlegel and Baisley did not elevate Hammond's concerns about Weintraub following their conversations regarding the sales lead dispute. ECF No. 62-1 at 26. But Hammond did not report Weintraub's sexual harassment to Schlegel and Baisley—she only reported the conflict about whether Hammond was permitted to contact potential customers identified as one of Weintraub's "leads." ECF No. 60-5 at 16 (Hammond Dep. 141:2–13). Thus, Schlegel and Baisley's lack of reporting is not evidence of noncompliance with the anti-harassment policy, let alone evidence that it was implemented in bad faith.

Finally, Hammond argues that TVC did not take action regarding Gray's alleged sexual assault even after her departure, "when [TVC] learned of Ms. Hammond's EEO complaint." ECF No. 62-1 at 26. Hammond rests this contention only on Schlegel's testimony that he did not investigate Hammond's sexual harassment complaints after learning about them. *Id.* (citing ECF No. 62-2 at 21). But this reads far too much into Schlegel's testimony: he was asked whether *he* had undertaken an investigation into Hammond's complaint after he learned about the instant litigation. ECF No. 62-2 at 22 (Schlegel Dep. 61:9–16). Schlegel did not testify regarding whether there was *any*

---

[4] In a similar vein, Hammond also raises Gray's non-reporting of what he testified were complaints of differential treatment based on race that Hammond reported to him about Weintraub. ECF No. 62 at 22; ECF No. 62-2 at 92 (Gray Dep. 14:17–15:21). But even construing that testimony favorably to Hammond, these complaints were not related to sexual harassment, the subject of the claim here and the company policy at issue. Thus, they are not evidence that TVC's policy regarding sexual harassment was adopted in bad faith.

investigation into Hammond's allegations, and TVC's policy states that "Niccolini or [his] designee" will undertake any investigation into complaints of sexual harassment. ECF No. 60-5 at 112. Hammond has not come forward with evidence that TVC failed to investigate her claims after she filed the EEOC complaint (which took place after her resignation) sufficient to permit a reasonable juror to conclude that TVC implemented its policy in bad faith.

Because TVC adopted and distributed an adequate anti-harassment policy, and there is no evidence to suggest that the policy was implemented in bad faith even when the record is construed in the light most favorable to Hammond, TVC has satisfied the first element of the *Faragher-Ellerth* defense.

On the second prong, "[t]he [*Faragher-Ellerth*] defense, in essence, imposes a duty on the victim to report her supervisor's harassing behavior to the employer." *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 278 (4th Cir. 2015). "[A]ny evidence that the plaintiff failed to utilize the company's complaint procedure 'will normally suffice to satisfy [the company's] burden under the second element of the defense.'" *Barrett*, 240 F.3d at 267 (quoting *Lissau v. Southern Food Serv., Inc.,* 159 F.3d 177, 182 (4th Cir. 1998)). "A generalized fear of retaliation does not excuse a failure to report sexual harassment. Instead, the law is specifically designed to encourage harassed employees to turn in their harasser because doing so inures to everyone's benefit." *Id.*

TVC prevails on the second prong as well because there is no factual dispute that Hammond failed to take advantage of the complaint procedure outlined in the policy or any informal opportunities to report sexual harassment to TVC. Hammond testified that she did not tell Schlegel, Baisley, or anyone else at TVC about Weintraub's sexual

19

harassment because she knew Weintraub was a high earner at the company, and had been told that he "was allowed to break the rules" because he "makes so much money for the company." ECF No. 60-5 at 16 (Hammond Dep. 141:7–9). Hammond states that because of this, she kept her conversations with Schlegel and Baisley concerning Weintraub's conduct "general." *Id.* at 30 (Hammond Dep. 193:13). Hammond also contends that she did not tell anyone at TVC about Gray's conduct because of a "fear of retaliation" in that her "job was hanging by a thread." ECF No. 62-1 at 29.

This rationale for non-reporting—a generalized fear of retaliation—is understandable. But it has been explicitly foreclosed as a basis for defeating a *Faragher-Ellerth* defense by the Fourth Circuit in *Barrett*. 240 F.3d 262. In that case, the defendant employer conceded that Barrett's supervisor had sexually harassed her during a business trip. 240 F.3d at 264. The employer had an anti-harassment policy that instructed employees to "contact any member of the management team" regarding harassment complaints. *Id.* at 265. But Barrett had not complained to "any of [the employer's] twelve managers . . . because she feared retaliation and she doubted that her complaints would be taken seriously." *Id.* at 267. Based on those facts, the Fourth Circuit held that the employer was entitled to summary judgment on its *Faragher-Ellerth* defense because "an employer cannot be expected to correct harassment unless the employee makes a concerted effort to inform the employer that a problem exists." *Id.* at 268 (quoting *Shaw v. AutoZone, Inc.*, 180 F.3d 806, 813 (7th Cir. 1999)). The Fourth Circuit has reaffirmed this holding in the intervening years. *See, e.g.*, *McKinney*, 711 F. App'x at 137 ("Failure to report harassment because of a generalized fear of retaliation or belief in the futility of reporting harassment deprives the employer of an

opportunity to take corrective action and does not justify the failure to report[.]") (citing *Barrett*, 240 F.3d at 267–68).

Hammond responds to this precedent by citing out-of-circuit cases in which courts found plaintiffs to have acted reasonably in not reporting sexual harassment and assault by supervisors due to specific threats of retaliation. *See Reed v. MBNA Mktg. Sys.*, 333 F.3d 27, 36 (1st Cir. 2003) ("[W]here there is a truly credible threat of retaliation that the complaint mechanism will not prevent, the employee's position is more hazardous and inaction more easily explained."); *Kramer v. Wasatch County Sheriff's Office*, 743 F.3d 726, 730 (10th Cir. 2014) ("[W]here the fear of complaining is not general or nebulous but is based on concrete reasons to apprehend that complaint would be useless or result in affirmative harm to the complainant, whether the plaintiff was reasonable and whether her fears are credible are questions of fact.") (quotations and alterations omitted). Some judges of this Court have similarly held that if the threat of retaliation is "tangible, real and reasonable" and "not . . . nebulous at all," then a plaintiff's failure to report may not be dispositive under *Faragher-Ellerth* prong two. *Martinez v. Bd. of Educ. of Prince George's Cnty.*, Case No. 19-cv-0169-PJM, 2020 WL 4926610, at *9 (D. Md. Aug. 21, 2020).

But in all those cases, unlike here, the plaintiff faced a tangible threat against making a complaint specifically. In *Reed*, the plaintiff's supervisor sexually assaulted her when she was 17 years old, and then "threatened her with discharge, telling her that they would both be fired if she reported his actions." 333 F.3d at 37. In *Kramer*, the plaintiff's supervisor sexually assaulted her and subsequently told her "to 'be quiet' and 'not say anything' or it would be 'a career ender,'" and also "threatened [her] with a poor evaluation unless she would 'keep [her] mouth shut and not say anything.'" 743 F.3d at

21

751. And as for *Martinez*, that case does not help Hammond either because there, unlike here, there was ample deposition testimony indicating that the alleged harasser had specifically and repeatedly threatened the plaintiff about filing a complaint, that the employer's "EEO Advisor" had discouraged the plaintiff from discussing the harassment, and that a similar complaint by another employee had been "leaked to" the harasser. 2020 WL 4926610, at *2, 9. Here, Hammond does not identify any specific threats regarding filing a complaint or speaking up, either express or implied, and does not contend that she feared complaining to Schlegel or Baisley, her official supervisors. She contends that Weintraub and Gray made general statements regarding their potential power over her continued employment. See ECF No. 62-1 at 29 (noting that Weintraub told Hammond "her job was safe as long as he wanted [her] there"). But there is no evidence or testimony in the record regarding statements specifically discouraging Hammond from lodging a sexual harassment or other complaint, as was the case in *Reed*, *Kramer*, and *Martinez*. Moreover, the record shows that Hammond had no issue writing to Schlegel and Baisley concerning her argument with Weintraub about the sales leads, and asking to be moved from his team. On this record, no reasonable juror could conclude that Hammond had a "tangible, real and reasonable" fear based on a specific threat against complaining. Accordingly, no reasonable juror could find against TVC on its affirmative defense, and thus TVC is entitled to judgment as a matter of law on Hammond's hostile work environment claim.

### ii. Does the *Faragher-Ellerth* defense apply to Maryland and Montgomery County law?

As noted above, Hammond asserts her harassment/hostile work environment claim (Count 2) under four separate statutes: Title VII, the Maryland Fair Employment

Practices Act (MFEPA), the Kansas Act Against Discrimination (KAAD), and the Montgomery County Code (MCC). The conclusion that TVC is entitled to summary judgment based on its *Faragher-Ellerth* defense disposes of her harassment claim under Title VII, as just explained, and under KAAD because Hammond does not contend otherwise. *See Labra v. Mid-Plains Const., Inc.*, 90 P.3d 954, 957 (Kan. Ct. App. 2004) ("Although federal cases construing Title VII . . . are not controlling, they are persuasive authority in the interpretation and application of the KAAD."). But there remains a question of law: does that defense apply to harassment claims under the Maryland Fair Employment Practices Act or the Montgomery County Code?

The Court is not aware of any state or federal authority directly addressing the applicability of *Faragher-Ellerth* after the General Assembly amended MFEPA in 2019, amendments that Hammond contends render the *Faragher-Ellerth* defense unavailable as a matter of law for harassment claims under MFEPA.[5] Thus, the Court must analyze whether the Supreme Court of Maryland would likely conclude that *Faragher-Ellerth* applies to MFEPA harassment claims.

MFEPA is "the state analogue of Title VII." *Brennan v. Deluxe Corp.*, 361 F. Supp. 3d 494, 498 n.2 (D. Md. 2019) (quoting *Alexander v. Marriott Int'l, Inc.*, RWT-09-2402, 2011 WL 1231029, at *6 (D. Md. Mar. 29, 2011)). Because of this, Maryland courts "traditionally seek guidance from federal cases in interpreting" MFEPA. *Haas v.*

---

[5] TVC cites *Hammoud*, 2024 WL 2749696, as applying the *Faragher-Ellerth* defense to an MFEPA claim. ECF No. 64 at 13. But that is an overreading. *Hammoud* alluded briefly to the availability of the *Faragher-Ellerth* defense but did not directly analyze its applicability to either the Title VII or MFEPA claims, because regardless of the applicability of the defense, the defendant there was not entitled to summary judgment. *Id.* at *11–14.

*Lockheed Martin Corp.*, 396 Md. 469, 481 (2007). Thus they generally apply "the same substantive standards and burden of proof as Title VII." *Thomas v. Advance Stores Co., Inc.*, Case No. 24-cv-763-LKG, 2025 WL 637465, at *3 (D. Md. Feb. 27, 2025). There are some exceptions to this general rule, however, as "MFEPA's language" is not "materially identical to that of Title VII." *Doe v. Cath. Relief Servs.*, 484 Md. 640, 657 (2023); *see also Watrous v. AIRtec, Inc.*, Case No. 24-cv-2076-TJS, 2025 WL 2494324, at *10 (D. Md. Aug. 28, 2025) ("[W]here the MFEPA materially departs from the language of Title VII, the MFEPA is not read in lockstep with the federal statute."). In *Catholic Relief Services*, for example, the Supreme Court of Maryland analyzed MFEPA's text and legislative history to determine that it "does not prohibit discrimination on the basis of sexual orientation," contrary to the U.S. Supreme Court's interpretation of Title VII in *Bostock v. Clayton County, Georgia*, 590 U.S. 644 (2020). *Cath. Relief Servs.*, 484 Md. at 559–60. That said, courts "import Title VII law into the analyses" under MFEPA "unless Maryland law clearly differs." *Membreno v. Atlanta Rest. Partners, LLC*, 517 F. Supp. 3d 425, 435 (D. Md. 2021); *accord Chappell v. S. Maryland Hosp., Inc.*, 320 Md. 483, 494 (1990) ("In the absence of legislative intent to the contrary," Maryland courts "read [MFEPA] in harmony with [Title VII].").

Here, Hammond argues that the *Faragher-Ellerth* defense is an area of divergence between Title VII and MFEPA. Hammond emphasizes new provisions of MFEPA that were adopted in 2019, particularly Md. Code Ann., State Gov't § 20-611. *See also* Acts 2019, c. 222 § 1 (Oct. 1, 2019). That provision states that "[i]n an action alleging a violation of this subtitle based on harassment, an employer is liable":

> (1) for the acts or omissions toward an employee or applicant
> for employment committed by an individual who:

24

> > (i) undertakes or recommends tangible employment actions affecting the employee or an applicant for employment, including hiring, firing, promoting, demoting, and reassigning the employee or an applicant for employment; or
> >
> > (ii) directs, supervises, or evaluates the work activities of the employee; or
>
> (2) if the negligence of the employer led to the harassment or continuation of harassment.

Md. Code Ann., State Gov't § 20-611. Hammond also points to MFEPA's definition of sexual harassment as "includ[ing] conduct, which need not be severe or pervasive, that consists of unwelcome sexual advances, requests for sexual favors, or other conduct of a sexual nature when":

> (1) submission to the conduct is made either explicitly or implicitly a term or condition of employment of an individual;
>
> (2) submission to or rejection of the conduct is used as a basis for employment decisions affecting the individual; or
>
> (3) based on the totality of the circumstances, the conduct unreasonably creates a working environment that a reasonable person would perceive to be abusive or hostile.

*Id.* § 20-601(k). Title VII does not contain such a definition, because federal hostile work environment claims based on sexual harassment are a type of sex-based discrimination claim rather than a separate statutory cause of action. *See Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 64 (1986) ("Without question, when a supervisor sexually harasses a subordinate because of the subordinate's sex, that supervisor 'discriminate[s]' on the basis of sex."). The 2019 amendments specified that employers are liable for harassment itself as an independent cause of action, not merely as a

derivative of a discrimination claim. Md. Code Ann., State Gov't § 20-606(a)(5) ("An employer may not . . . engage in harassment of an employee.").

Hammond contends that these provisions represent "a wholesale rejection of the *Faragher-Ellerth* defense." ECF No. 62-1 at 16. But the amendments do not reveal a legislative intent to "reject" the *Faragher-Ellerth* defense. The statutory text provides for a standalone substantive claim for sexual harassment (as opposed to a judicially created cause of action based on a statutory prohibition on discrimination) and codifies the elements of that claim; it says nothing about the applicability of a defense. In other words, prior to the 2019 amendments, MFEPA plaintiffs could *already* bring sexual harassment claims, relying on an interpretation of Md. Code Ann., State Gov't § 20-606(a)(1), which prohibits discrimination, analogous to the way federal courts continue to interpret Title VII. *See, e.g.*, *Knox v. Mayor & City Council Baltimore City*, Case No. 17-cv-1384-JKB, 2017 WL 5903709, at *7 (D. Md. Nov. 30, 2017). Removing the "severe and pervasive" requirement, Md. Code Ann., State Gov't § 20-601(k), and broadening the standard for imputability, *id.* § 20-611, pertain to a plaintiff's prima facie case; they do not undermine the applicability of the *Faragher-Ellerth* defense. *See Watrous v. AIRtec, Inc.*, 2025 WL 2494324, at *10 ("The elements of a harassment or hostile work environment claim under the MFEPA are otherwise the same as those under Title VII."). Given that the Supreme Court of Maryland has held that MFEPA should be interpreted consistent with Title VII, *Chappell*, 320 Md. at 494, and the 2019 amendments do not indicate a legislative intent to deviate from federal law with respect to the *Faragher-Ellerth* defense, the Court concludes that the defense applies to MFEPA claims just as it applies to Title VII claims. Because there is no genuine dispute of material fact

26

regarding TVC's *Faragher-Ellerth* defense, as explained above, TVC is entitled to summary judgment on Hammond's MFEPA harassment claim.

The same is true for Hammond's harassment claim under Montgomery County law. Chapter 27 of the MCC "prohibits qualifying employers from acts of discrimination, harassment and retaliation." *Thomas*, 2025 WL 637465, at *3. Like MFEPA claims, MCC claims are generally analyzed under Title VII standards unless there is a clear divergence in the statute. *Membreno*, 517 F. Supp. 3d at 435–36; *see also Whittaker v. David's Beautiful People, Inc.*, Case No. 14-cv-2483-DKC, 2016 WL 429963, at *3 n.2 (D. Md. Feb. 4, 2016) ("Maryland courts construe [MCC] claims similarly to those made under Title VII."). Hammond points to MCC § 27-19(a)(1)(C), which forbids employers from "subject[ing] an individual to harassment, including sexual harassment." Hammond also notes that, similar to MFEPA and unlike Title VII, the MCC explicitly does not require the harassment to be "severe and pervasive" in order to be actionable. MCC § 27-19(b)(3). Again, however, these differences concern the elements of a plaintiff's cause of action and/or *prima facie* case, not the availability of a defense. For the same reasons that the *Faragher-Ellerth* defense applies to Hammond's MFEPA claims, the defense shields TVC from liability for Hammond's MCC claims as well.

## B.   Retaliation

In addition to arguing that she was subjected to a hostile work environment, Hammond argues that she engaged in protected activity when she "opposed Weintraub's harassing conduct" and was unlawfully retaliated against when Schlegel issued the first written warning to Hammond, in November 2021, about falling short of her performance expectations. ECF No. 62-1 at 33. She does not rely on any opposition to Gray's conduct in support of her retaliation claim. *Id.*; *see also* ECF No. 1 ¶ 62 ("Plaintiff

. . . engaged in protected activity . . . when *inter alia*, she (1) opposed Weintraub's harassing conduct in conversations with Weintraub; and (2) opposed Weintraub's harassing conduct in conversations with Temple View management."). For the following reasons, under the relevant legal standards TVC is entitled to summary judgment on that claim too.

Title VII, in addition to prohibiting discrimination, prohibits employers from "retaliat[ing] for the employee's opposing the employer's illegal discrimination practices or participating in Title VII enforcement proceedings." *Williams*, 86 F. Supp. 3d at 417 (citing 42 U.S.C. § 2000e–3(a)). A Title VII retaliation claim requires a plaintiff to prove that "(1) the plaintiff engaged in a protected activity . . .; (2) the employer acted adversely against the plaintiff; and (3) the protected activity was causally connected to the employer's adverse action." *Okoli*, 648 F.3d at 223. As the parties agree, Maryland, Kansas, and Montgomery County law mirror federal Title VII standards regarding retaliation claims. *See Maryland Dep't of Health v. Best*, 264 Md. App. 181, 203 (2024) ("[W]e may utilize the same criterion as applied under Title VII to 'determine whether a prima facie violation of the state law was established.'") (quoting *Chappell*, 320 Md. at 496); *Mitchem v. Sleepcair, Inc.*, Case No. 20-cv-2627-DDC-GEB, 2021 WL 4439406, at *5 (D. Kan. Sept. 28, 2021) ("Courts analyze KAAD discrimination claims using the same analysis governing federal Title VII . . . claims."). TVC has not contested element 2 at the summary judgment stage, in light of Hammond's negative "write-up." TVC instead contends that Hammond cannot establish elements 1 and 3. ECF No. 60-1 at 19–20.

"Employees engage in protected oppositional activity when, inter alia, they 'complain to their superiors about suspected violations of Title VII.'" *Boyer-Liberto*, 786

F.3d at 281. Hammond contends she engaged in such protected activity when she "opposed Weintraub's harassing conduct in conversations" (1) "with Weintraub," (2) "with Mr. Schlegel and Mr. Baisley" and (3) "with Mr. Gray." ECF No. 62 at 33. The undisputed evidence, however, establishes that at least the second and third conversations did not rise to the level of protected activity. As for the conversations with Schlegel and Baisley, Hammond has conceded that she never discussed complaints of sexual harassment with any of them. ECF No. 60-5 at 16 (Hammond Dep. 141:2–13). Although there is evidence that she approached Gray to express concerns about Weintraub, Hammond has only asserted that her complaints to Gray about Weintraub concerned discrimination against her because of her race. *See* ECF No. 62-1 at 26, 33; ECF No. 60-12 at 5 (Gray testifying that Hammond told him "[s]he was going through some issues with . . . Dave Weintraub. . . . that she deemed as racial. She deemed [that] she was being unfairly treated and so on and so forth."). Hammond has only pled allegations of retaliation related to complaints of sex-based, not race-based, discrimination. *See* ECF No. 1 ¶¶ 10–34, 60–65.

That leaves Hammond's claim that she engaged in protected activity when she "opposed Weintraub's harassing conduct in conversations with Weintraub." ECF No. 62-1 at 33. The Fourth Circuit has not yet resolved whether a plaintiff's opposition to sexual harassment by a supervisor constitutes protected activity for a Title VII retaliation claim. But at least two district courts in the Fourth Circuit have held that it does. *See Cooper v. Baltimore Gas & Elec. Co.* 2024 WL 3849526, at *18 ("[A] Plaintiff's allegations that she 'refused to provide' a continued sexual relationship with [a supervisor] and that she informed him she would not continue the sexual relationship are sufficient to satisfy the requisite protected activity."); *Owen v. County of Franklin,*

29

*Virginia*, 358 F. Supp. 3d 545, 550 (W.D. Va. 2019) (holding similarly). The Court will assume without deciding that Weintraub was her supervisor and that opposition to supervisor sexual harassment counts as protected activity, because regardless Hammond has failed to establish causation.

The third element of a *prima facie* case of retaliation is causation, i.e. a connection between the protected activity and the adverse action (here, the November 2021 written performance warning). "[E]stablishing a 'causal relationship' at the *prima facie* stage is not an onerous burden." *Strothers*, 895 F.3d at 335. "Purported victims of retaliation do not have to show at the *prima facie* stage that their protected activities were but-for causes of the adverse action." *Id*. Instead, a plaintiff may establish causation by showing that "(1) the employer either understood or should have understood the employee to be engaged in protected activity and (2) the employer took adverse action against the employee soon after becoming aware of such activity." *Id*. at 336.

To prove that Schlegel issued the written warning in November 2021 in retaliation for Hammond allegedly rebuffing Weintraub's advances, Hammond relies solely on the temporal proximity between the two events. ECF No. 62-1 at 33 ("That TVC issued Ms. Hammond the November 2021 write-up less than one month after discovering she opposed Mr. Weintraub's sexual advances 'weighs heavily in favor of finding a genuine dispute as to causation'") (quoting *Cowgill v. First Data Techs., Inc.*, 41 F.4th 370, 381 (4th Cir. 2022)). Hammond is correct that temporal proximity can sometimes "suffice[] to show a causal relationship." *Sempowich v. Tactile Systems Technology, Inc.*, 19 F.4th 643, 654 (4th Cir. 2021) (citing *Strothers*, 895 F.3d 317). But a plaintiff relying on temporal proximity must also "show[] that (1) the employer either

understood or should have understood the employee to be engaged in protected activity and (2) the employer took adverse action against the employee *soon after* becoming aware of such activity.'" *Id.* (quoting *Strothers*, 895 F.3d at 336). "An employer is aware of an employee's protected activity when he learns of an employee action that he understood or should have understood to be opposition against a Title VII violation." *Strothers*, 895 F.3d at 336; *see also Roberts v. Glenn Indus. Grp., Inc.*, 998 F.3d 111, 124 (4th Cir. 2021) ("[W]here a relevant decisionmaker is unaware of any prior complaints, a plaintiff cannot establish the necessary causal connection between his filing a complaint and his termination. It necessarily follows, therefore, that the plaintiff cannot establish a *prima facie* case of retaliation.") (quotations and alterations omitted).

The problem for Hammond is that although there was close temporal proximity between Hammond's opposition and Schlegel's warning letter, there is no evidence that Schlegel, Baisley, or any member of TVC management was aware of Hammond's opposition to Weintraub's harassment (or even of the harassment itself). Hammond conceded at deposition that she never told anyone at TVC about Weintraub's harassment. ECF No. 60-5 at 16 (Hammond Dep. 141:2–13). The primary conversation she had with Schlegel and Baisley concerned her conflict with Weintraub over the sales leads, a conversation that she testified she kept "general." *Id.* at 30 (Hammond Dep. 193:13). Complaints "need not include 'magic words' such as 'sex' or 'sexual' to be effective." *Okoli*, 648 F.3d at 224 n.8. But here there is no evidence establishing any nexus between Hammond's opposition to Weintraub and Schlegel's warning letter. *See Roberts*, 998 F.3d at 124 ("To establish a causal relationship between the protected activity and the termination, a plaintiff must show that the decisionmaker was aware of the protected activity at the time the alleged retaliation occurred.").

In short, there is no evidence in the record of a causal relationship between Schlegel's November 2021 write-up and Hammond's opposition to the alleged harassment by Weintraub. Thus, Hammond cannot establish a prima facie case of retaliation under either Title VII or state law, and TVC is entitled to summary judgment on these claims as well.

## IV.   PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT ON DEFENDANT'S WIRETAP COUNTERCLAIM

The Maryland Wiretap Act makes it unlawful to "[w]illfully intercept, endeavor to intercept, or procure any other person to intercept or endeavor to intercept, any wire, oral, or electronic communication." Md. Code Ann., Cts. & Jud. Proc. § 10-402(a). Thus Maryland is a "two-party consent" state, meaning Maryland law generally prohibits audio-recording conversations unless "all of the parties to the communication have given prior consent." *Id.* § 10-402(c)(3). The Wiretap Act includes a civil cause of action for violations. *Id.* § 10-410. TVC alleges that Hammond's recordings of her TVC co-workers and supervisors violated the Act. TVC's claim fails as a matter of law, however, because civil liability under the Wiretap Act does not attach for recordings made outside Maryland and the undisputed evidence establishes that Hammond was outside of Maryland when she made the recordings.[6]

---

[6] Hammond initially moved for partial summary judgment, arguing that (1) the Wiretap Act does not apply to conversations in which *no* participant was in Maryland and (2) TVC's claim fails with respect to conversations that took place over Microsoft Teams because TVC's policy is that electronic communications are "the property of the Company." ECF No. 63 at 5. Hammond has subsequently sought summary judgment as to the entirety of TVC's counterclaim based on the absence of a legislative intent to overcome the presumption against extraterritoriality. ECF No. 75 at 1–4.

"[U]nless an intent to the contrary is expressly stated, acts of the [Maryland] legislature will be presumed not to have any extraterritorial effect." *Chairman of Bd. of Trustees of Emp. Ret. Sys. v. Waldron*, 285 Md. 175, 183–84 (1979). Nothing in the Wiretap Act indicates that it was meant to reach an individual making a recording in a different state, even if the person being recorded is in Maryland. The courts that have considered this question have held that a defendant cannot be sued if they made recordings while outside of Maryland. In *Sprye v. Ace Motor Acceptance Corporation*, the Circuit Court of Montgomery County granted a motion to dismiss a wiretap claim where the defendant had made all the recordings in question in North Carolina. Case No. 423332-V, 2017 WL 11633219 (Md. Cir. Ct. Sep. 29, 2017); *see also Arndt v. Gov't Emps. Ins. Co.*, 750 F. Supp. 3d 518, 525 n.1 (D. Md. 2024) ("Maryland courts have found that [the Wiretap Act] does not have extraterritorial effect."). Neither *Sprye* nor *Arndt* was issued by a Maryland appellate court and thus neither is precedential, but this Court is persuaded by their reasoning. The text of the Wiretap Act does not indicate that it is meant to apply extraterritorially, and thus the normal presumption against extraterritoriality applies and TVC has not shown that it has been overcome.

TVC points to Supreme Court of Maryland cases holding that recordings made in violation of the Wiretap Act are inadmissible as evidence even if the recording was made outside of Maryland. *See Mustafa v. State*, 323 Md. 65, 75 (1991) ("[The Wiretap Act] precludes the admission of a communication intercepted, no matter where, under circumstances inconsistent with this State's substantive law."); *Miles v. State*, 365 Md. 488, 509 (2001) (citing *Mustafa* and holding similarly). But as the *Sprye* court noted, *Mustafa* was "about the admissibility of evidence in Maryland courts." 2017 WL 11633219, at *3. Although "Maryland may not ordinarily proscribe conduct occurring

33

outside its boundaries," "[q]uite plainly . . . it may regulate the admissibility of evidence in its courts." *Mustafa*, 323 Md. at 75.

Applying this standard, Hammond cannot be civilly liable under the Wiretap Act because the undisputed evidence establishes that her recordings took place outside of Maryland. Hammond states that for certain recordings she was at her home in Kansas. ECF No. 63-1 at 19–104. For others, she is not certain of her location but she most likely was in Kansas or Michigan. *Id.* While the Court must construe the facts in TVC's favor as the non-movant, TVC has not come forward with any evidence that Hammond was in Maryland when she made any of these recordings. Accordingly, Hammond is entitled to summary judgment on TVC's counterclaim.

## V.      CONCLUSION AND ORDER

For the foregoing reasons, the Court will grant both motions for summary judgment. A separate order follows.

Date:  March 27, 2026

_____/s/_____

Adam B. Abelson
United States District Judge